Per Curiam.
Kennedy purchased of Crawford 420 acres of land, which, on the 26th of October, 1797, he sold to Brittain Bryant for $400. Bryant gave two bonds for part of the purchase money; one for ¿6100, Kentucky currency, payable on the first of March, 1799, the other for the same sum, payable on the first of March, 1800, with Lemuel Sugg his surety in each. Bryant, on the same day, gave another bond for ¿680 or a negro boy; this bond was satisfied. Kennedy, on the same day, gave * a bond with Crawford, his surety, to convey the 420 acres to Bryant on the first of December, 1799. The grant issued to Crawford for 640 acres, on the 17th of November, 1790. It was "brought from the secretary’s office to this State sometime after the year 1804 or 1805. On the 17th of October, 1806, Crawford executed a deed for 420 acres to Kennedy, which *160 was proved in August, 1807, and registered afterwards. Bryant caused 420 acres to be laid off, part of this tract of 640 acres, before his removal, which took place about 1800 or 1801. He had a plat made out by a surveyor, and lived on the 420 acres some years; he then assigned to Sugg, removed to Natchez, and died; Sugg assigned to Bunn, for whose benefit the land was rented one or two years ; Bunn died, and his administrator sued Sugg for not making a title ; obtained judgment, and had execution in 1808. In 1807, Sugg assigned Kennedy’s bond for title to Woolfolk. In 1806, Crawford, in person, offered to convey to Sugg, and to give further time for payment of the purchase money on being secured. Sugg refused. On the 17th of August, 1807, Crawford conveyed to Bell 220 acres, part of the 640, being the part left after laying off 420 for satisfaction of his bond to Bryant. On the 22d of September, 1807, Kennedy empowered Donelson to convey the 420 acres to Sugg or his assigns; on the 20th of September, 1808, he renewed this power. Kennedy’s bond for title bound him to convey 420 acres, to be chosen by Bryant out of Hollis’s preemption, being the same lands granted to Crawford. In 1811, Woolfolk sued Kennedy on his bond for title, and obtained judgment; Kennedy filed this bill and obtained an injunction. Sugg settled on the land in 1800, and died there ; it is still the residence of his widow. Sugg became insolvent in 1808. Bryant left a considerable estate at his death. In 1806, Crawford desired Sugg to make choice, or sav, as an indifferent person, where choice ought to be made, so as to be agreeable * to the bond for title; but he would not. In 1806, Woolfolk told Donelson, then acting as Crawford’s agent, that he had laid off the land for Bryant, and had given him a plat. He described to Donelson how he had run the lines, "who ran them again, and after this the residue of the tract was conveyed to Bell to satisfy a bond made formerly by Crawford. One plat and certificate of the original survey upon which the grant was to issue lay some time by mistake or by being overlooked, in .the surveyor’s office. On discovering this, Donelson, supposing that no other had been transmitted, made another survey, and caused the plat and certificate to be sent on to the secretary’s office. The grant, however, was then in the office, though it could not, on search, be found at first. Bryant and those claiming under him have never been disturbed in their possession ; and, ever since the year 1806, might *161 have bad a conveyance at any time on payment of the balance of the purchase money. The two bonds for payment of the purchase money are yet unpaid. Several witnesses say the 420 acres could not be laid off to more advantage than it was by the survey of Donelson. Upon these facts it is to be determined whether Kennedy shall not have a decree for the balance of the purchase money, and to compel Woolfollc to receive the 420 acres of land in lieu of his judgment at law. A vendor has a lien upon the lands sold for the purchase money, whether conveyed to the vendee or not, even although the purchase money be secured by bond, covenant, or note ; not only against the vendee, but his heirs also, and those claiming under him with notice of the vendor’s equity. In case of necessity, the court may order a sale of the lands, subject to such lien for satisfaction of such part of the purchase money as remains due. Sug. 352, 360, 364. Here that part of the purchase money which is still due has been so, as to part, ever since March, ,1800 ; as to the other part, ever since March, 1799. Kennedy might well * insist upon payment as a simultaneous act with the conveyance to be made on his part; especially after Sugg became insolvent, or even in declining circumstances, and Bryant had moved to so great a distance. Therefore, much of the delay which has arisen in this cause is not imputable to any unreasonable exaction on the part of Kennedy, but to the tardiness of the purchaser, who has not yet paid the whole- of the purchase money. It is conceived that no valid objection can be made to a specific execution of the contract as required by Kennedy ; for if it be urged that he did not and could not make a title on the first of December, 1799, the principal answer is, he was hindered by misinformation as to the emanation of the grant, or by an unexpected delay in procuring the grant, occasioned by the supineness of a public officer. The possession, in the mean time, was in the vendee, who consequently has sustained no material injury. ■ It may be answered further, that lapse of time may be compensated, where time was not of the essence of the contract; in other words, was not a circumstance without a strict compliance with which the contract would not have been made, in the particular case before the court. Sug. 245, 247, 248. More particularly does lapse of time lie in compensation, when caused by a difficulty in obtaining the legal title by the vendor, if he is ready by the time of pronouncing the decree. Sug. *162 250; 2 P. W. 629; 6 Ves. junior, 646; 7 Ves. junior, 263; 1 Esp. Cases, 184; Sug. 252; 1 P. W. 146. Much more will this indulgence be allowed to the vendor, if the purchaser, at the time of the contract, knew of his defect of title, and that it was to be procured or perfected after making the contract. Sug. 253. In this case there is another circumstance of great weight, though it may not be mentioned in the books as such. Bryant and Sugg and Bunn, respectively, continued in possession after the first of December, 1799, and even up to this day. This seems to be a waiver on the part of the * purchaser of any option he might have of relinquishing the contract. It is equivalent to saying, I will, notwithstanding my advantage, adhere to the contract. These implied renunciations of abandonment were, after the year 1799, quite up to the time of the assignment of Woolfolk. The subsequent possession of Sugg must be viewed as pursuant to the contract, by the permission of Woolfolk ; lapse of time, therefore, cannot be justly opposed to a specific execution as prayed for by the complainant. Neither can it be urged successfully that Wool-folk is not liable to the demand of Kennedy, in the same manner as Bryant was. He has taken the place of Bryant by purchasing his equity. What is that? To be liable to a specific execution as well as to be entitled to one. Kennedy had a right to say, Take your land, and pay me the purchase money. Bryant could not say, Convey me the land, and wait for the purchase money till it suits my convenience to pay you, or run the risk of my insolvency, and that of my surety. Can Bryant, by assignment, place Woolfolk in a situation which he himself could not occupy ? Can he and Woolfolk, or Sugg, his assignee, and Woolfolk, in the absence of Kennedy, make an agreement which could, in any degree, abridge the existing right of Kennedy? If not, then he can still say, Take the land, and pay me the money. If necessary, it might be inquired whether he who buys a bond for title is exempt from any equity the obligee was subject to, whether he had notice or not of a default in payment of the purchase money. There is no occasion, however, to determine that point now. Here, most clearly, Woolfolk knew of all the material circumstances relating to this •transaction, and that undoubtedly subjects him to all the equity that Bryant was subject to.
Decree that on or before the expiration of six months from this *163 day the defendant, Woolfolk, shall cause the balance of the purchase money yet due * to be paid to the complainant, who, at the same time, shall convey to him, in fee, with general warranty, the said 420 acres of land so as not to interfere with the 220 acres conveyed to Bell. The deed of conveyance to be approved of by the clerk and master of this court. And if, at the expiration of the said six months, the said balance shall not be paid, then that so much of the said 420 acres shall be sold by the sheriff as will be sufficient to raise the said balance, which shall be paid to the complainant; he, at the same time, making a deed, in fee with general warranty, to the residue of the said 420 acres, to the said Woolfolk; and the injunction in this case shall be perpetuated. It is further ordered, that the clerk, and master shall report to-morrow morning the amount of principal and interest due upon the said two bonds for £100 each. And further, that the costs of this suit and of the action at law be paid by the defendant Woolfolk.
See, as to rescission of executed and executory contracts, the authorities collected in King’s Digest, 2743 et seq. As to specific performance in favor of assignees, Hall v. Ross, 3 Hay. 200; Howard v. Moore, 4 Sneed, 317; Craig v. Leiper, 2 Ter. 193; Harper v. Lindsey, Meigs, 310; Macon v. Sheppard, 2 Hum. 335; Robertson v. Auld, 6 Yer. 406; Pillow v. Pillow, 3 Hum. 344; Irby v. McKesick, 8 Yer. 42. As to lapse of time in cases of specific performance King’s Digest, 2912 et seq. As to want of title in such cases, King’s Digest, 2100 et seq. See King’s Digest, 2745, 2896, 2904, 2921.